## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

MILOUS BROWN,

|  |  |  |  |
|---|---|---|---|
| | Plaintiff, | : | Case No. 2:19-cv-2425 |

District Judge Michael H. Watson
-  vs  -                                       Magistrate Judge Michael R. Merz

DAVID GRAY, WARDEN,
 Belmont Correctional Institution, et al.,

                    Defendants.              :

---

## REPORT AND RECOMMENDATIONS

---

This civil rights case, brought *pro se* by Plaintiff Milous Brown pursuant to 42 U.S.C. § 1983, is before the Court on Motion for Summary Judgment of Defendants Owen McRobie and John Ruiz (ECF No. 34).  Plaintiff has filed an Opposition (ECF No. 45) and Defendants have filed a Reply in support (ECF No. 54), rendering the motion ripe for decision.

Magistrate Judge Jolson, to whom this case was originally referred, recommended dismissal of all Defendants except Defendants McRobie and Ruiz (hereinafter collectively "Defendants") and of all claims except the claim for retaliation for exercise of First Amendment rights (Report and Recommendation, ECF No. 17, supplemented at ECF No. 23).  District Judge Watson adopted that Report without any objections by Plaintiff (ECF No. 25).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;  the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id*. The

2

opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than *de minimis*. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n*., 968 F. 2d 606, (6th Cir. 1992).

3

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

The facts set forth in this Report are admitted or established by evidence competent under Fed. R. Civ. P. 56(c) and not controverted by opposing competent evidence.

## Analysis

**Individual Versus Official Capacity**

At the outset of their Motion, Defendants assert they are entitled to presume they are being sued in their official capacity because Plaintiff did not state in what capacity they were sued. (Motion, ECF No. 24, PageID 260, relying on *Soper by Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999).)

Plaintiff responds by claiming his Complaint shows he intended to sue these Defendants in both their official and individual capacities (Opposition, ECF No. 45, PageID 321). He purports to quote the Complaint as stating "Each Defendant is sued **individually** and in his official capacity. At all times mentioned in this complaint each defendant acted under the color of state law," and further "A simple reading of the Complaint clearly shows that: "Each Defendant is sued

4

INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY. " *Id.* Plaintiff does not state where these quotations appear in the Complaint.

Despite a repeated reading and an electronic search for the purported quotations, the Magistrate Judge cannot find the language which Plaintiff is purportedly quoting. However Plaintiff did set forth damage amounts being sought from these Defendants individually and did have them served individually with process. The Magistrate Judge finds the course of the proceedings adequately advised these Defendants that they were being sued in their individual capacities.

Judgment against a public servant in his official capacity imposes liability on the entity he represents. *Brandon v. Holt*, 469 U.S. 464 (1985); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Here the entity represented by these Defendants is the Ohio Department of Rehabilitation and Corrections. Because ODRC is an arm of the State of Ohio, a damages claim against these Defendants in their official capacities is barred by the Eleventh Amendment. *Papasan v. Allain,* 478 U.S. 265, 276 (1986); *Hans v. Louisiana*, 134 U.S. 1 (1890); *Edelman v. Jordan*, 415 U.S. 651 (1974); *Florida Dep't. of State v. Treasure Salvors, Inc.*, 458 U.S. 670 (1982).

Further analysis in this Report is limited to any possible liability of Defendants in their individual capacities.

**Liability Under 42 U.S.C. § 1983**

Plaintiff brought this action under 42 U.S.C. § 1983. That statute, R.S. § 1979, was adopted as part of the Act of April 20, 1871, and reads, as amended:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of

> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress , except
> that in any action brought against a judicial officer, injunctive relief
> shall not be granted unless a declaratory decree was violated or
> declaratory relief was unavailable.  For the purposes of this section,
> any Act of Congress applicable exclusively to the District of
> Columbia shall be considered to be a statute of the District of
> Columbia.

The statute creates a cause of action sounding essentially in tort on behalf of any person deprived of a federal constitutional right by someone acting under color of state law. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 709 (1999); *Memphis Community School District v. Stachura,* 477 U.S. 299 (1986); *Carey v. Piphus,* 435 U.S. 247 (1978); *Monroe v. Pape*, 365 U.S. 167 (1961).  The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.  *Wyatt v. Cole*, 504 U.S. 158 (1992).  In order to be granted relief,  a plaintiff must establish that the defendant deprived him of a right secured by the U.S.  Constitution and the laws of the United States and that the deprivation occurred under color of state law.  *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

There is no question that Defendants were acting under color of state law in their actions with respect to Plaintiff on November 9, 2018.  The question is whether by their actions they deprived him of any right protected by the United States Constitution.  Judge Jolson found that the Complaint properly stated a claim for relief for retaliation against Plaintiff for his exercise of his First Amendment right of access to the courts (Report, ECF No. 17, PageID 183-85).  The question

on summary judgment is whether Plaintiff has submitted sufficient evidence from which a jury

could find in his favor.

The parties agree that the standard for a First Amendment retaliation claim is set forth in

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999). In that case the Sixth Circuit held:

> A retaliation claim essentially entails three elements: (1) the plaintiff
> engaged in protected conduct; (2) an adverse action was taken
> against the plaintiff that would deter a person of ordinary firmness
> from continuing to engage in that conduct; and (3) there is a causal
> connection between elements one and two -- that is, the adverse
> action was motivated at least in part by the plaintiff's protected
> conduct.

*Id.* at 394.

To prove his case under this standard, Plaintiff asserts he was engaged in the protected

conduct of litigating a case is court.  He does not tell us what case it was, but says the filing was

due in Federal District Court (Affidavit, ECF No. 45-1, PageID 327).  Given the dates involved, it

could well have been his first habeas corpus action attacking his present conviction and sentence.

That case was filed in this Court March 9, 2016, and promptly transferred to the Northern District

of Ohio as the appropriate venue (Case No. 2:16-cv-215 in this District and Case No. 4:16-cv-600

in the Northern District).  Plaintiff does not explain to this Court what deadline he had around

November 9, 2018, in that or any other case he may have had pending at that time.  He explains

that he was concerned that the paper he was mailing reach the court to which it was directed "before

the deadline," but he does not tell this Court what the deadline was.  Because Plaintiff was

incarcerated, he was entitled to the benefit of the "mailbox rule" which provides that a prisoner's

filing is timely if it is deposited in the prison mailing system by the deadline.  *Houston v. Lack,*

487 U.S. 266 (1988); *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).  Thus although Plaintiff

was understandably concerned that the court get his filing, he would have met the deadline even if money for postage had not been withdrawn from his prison account as promptly as he wished.

Plaintiff does not claim that his legal filing was not actually mailed or that he suffered any difficulty from the court in which it was filed because of later delivery[1]. He has not submitted data to show when or if the necessary withdrawal from his account to pay for postage was made. Indeed Plaintiff has not offered any evidence or made any argument that the events of November 9, 2018, had any impact on his actual access to the courts.

**Evidence Submitted on the Motion for Summary Judgment**

The Motion for Summary Judgment was filed August 17, 2020, and is supported by the Affidavits of Defendant Sgt. Owen McRobie, Defendant Unit Manager John Ruiz, and Captain Dustin Howell, who was neve sued in this case.

Sergeant McRobie submitted his Affidavit with the Motion for Summary Judgment. He avers

> 5. Two days later, on November 9th, 2018, inmate Brown approached me inquiring about his legal mail. He told me that he checked his account and money had not yet been debited from his account to pay for the postage. He said that he had spoken to John Ruiz, the housing unit manager for 1 House, on the matter who told him to come and see me.

> 6. I told him that I had done my job and taken it to the cashier's office. At the time inmate Brown came to my office, I was busy with other matters, but I told him that I would look into it and get back to him. Inmate Brown then left my office.

---

[1] Given recent difficulties with the United States Postal Service, late arrivals of filings from prisoners have unfortunately become too common, but it is not alleged that happened here.

7. Apparently inmate Brown was not satisfied with my response. After leaving my office, inmate Brown went to Lt. Howell's office to discuss the issue of his legal mail. Access to Captain Howell's office is restricted and inmates are prohibited from entering directly into that office.

8. Captain Howell instructed inmate Brown that the issue of his legal mail was for his unit to handle and to go back to his unit.

9. Not long after, inmate Brown returned to my office along with unit manager Ruiz, to again inquire about the status of his legal mail. He had apparently spoken with unit manager Ruiz both before and after he came to see me, in addition to speaking with Captain Howell.

10. I responded again to inmate Brown, in the presence of Mr. Ruiz, that I will look into his matter and let him know once I had an answer. I have many responsibilities in my job, some of which are time sensitive, and I can't do everything at once.

11. Inmate Brown did not appear satisfied with my response, but he did leave my office.

12. After inmate Brown left my office, I received a call from Captain Howell regarding inmate Brown's having come to his office. Inmates are prohibited from entering restricted areas of the prison, and the Captain's office is a restricted area.

13. Captain Howell and I discussed the nature of inmate Brown's issue and his repeated failure to accept my response and wait for me to get back to him. During my encounters with inmate Brown that day, he was difficult to deal with and uncooperative.

14. During the phone call, Captain Howell ordered me to locate inmate Brown and take him directly to segregation for a time-out. Under this procedure, inmates that have become uncooperative and/or hostile, or who have violated prison rules, are placed in a segregated unit. This is called a security control placement. The amount of time an inmate spends in segregation depends on the nature and severity of the inmate's conduct.

9

15. At the time Captain Howell ordered me to locate inmate Brown, I had no idea where he was. I looked in the dorm and in the yard. In the yard area, I could see through a window that inmate Brown was in the lobby area.

16. I approached inmate Brown and told him to cuff-up because I've been ordered by Captain Howell to take him to segregation. Inmate Brown did as he was instructed and I escorted him to segregation.

17. During the time-out period, command staff then reviewed the facts and circumstances of the inmate's situation in more detail with the unit supervisory staff to determine whether the inmate violated any prison rules and if so, whether the inmate would receive an incident or conduct report for their actions.

18. In inmate Brown's case, it was determined that he would not be assigned to segregation for a longer period of time. Therefore his time in segregation was no longer than about three hours. In many situations, spending a couple of hours in segregation provides the inmate with time and privacy to calm down and regroup.

19. At the time an inmate is assigned to segregation for any amount of time (even if it ends up being for just a couple of hours), that inmate's current housing assignment identifies as 'open' in our online housing system.

20. It is not at all uncommon for an open bed to be reassigned to a new inmate within a short period of time, which is what happened to inmate Brown.

21. When inmate Brown was released from his time-out in segregation, his bed had been reassigned to another inmate. It's that simple. Inmate Brown did not receive a new bed assignment out of retaliation. He was reassigned because his open bed was reassigned to a new inmate by the count office.

22. Even though inmate Brown had to move to a new bed, he stayed in the "A" unit. He simply went from '1 House in Unit A' to '2 House in Unit A'. They are right beside each other. There is no difference

10

> in the types of inmates or security classifications of inmates assigned
> to 1 House vs. 2 House in Unit A. None whatsoever. There are no
> beds in either House that are reserved for problem inmates.

(McRobie Affidavit of April 27, 2020, ECF No. 34-2).  The Ruiz Affidavit, which is much briefer,

is consistent with McRobie's.

Captain Howell's Affidavit avers:

> 3. On November 9, 2018, inmate Milous Brown walked into my
> office and began asking me questions about legal mail that he
> submitted to Sgt. Owen McRobie. Inmate Brown said something
> about money not being taken from his account [to] pay for the
> postage and that neither Sgt. McRobie nor Unit Manager John Ruiz
> would assist him regarding his inquiry

> 4. Inmates are restricted from directly entering my office without
> my inviting, or ordering, an inmate to come and speak with me about
> an issue that I, as a captain. need to address. That didn't stop inmate
> Brown from walking directly into my office without permission to
> do so.

> 5. While Inmate Brown was in my office, he was persistent and
> demanding. Inmate Brown was argumentative and not willing to listen
> as I was giving him guidance as to how to proceed with his complaint.
> I then instructed Brown to go back to his unit to speak with Sgt.
> McRobie, who should be handling the issue.

> 6. Not long after inmate Brown left my office, I called Sgt. McRobie
> and discussed my encounter with inmate Brown. Sgt. McRobie
> explained that he had already spoken to inmate Brown about his legal
> mail issue prior to Brown barging into my office. Sgt. McRobie stated
> that he had advised inmate Brown that he would be looking into the
> issue of his legal mail and that inmate Brown had become loud and
> disruptive.

> 7. Based on inmate Brown's demanding behavior and unwillingness
> be patient while Sgt. McRobie looked into the issue of his legal mail,
> I instructed Sgt. Mc Robie to locate inmate Brown and place him in
> restraints and take him directly tb a Transitional Programming Unit
> (TPU) holding cell.

8. Inmates are typically placed into holding cells pending a decision by the shift Captain as to whether the inmate's behavior warrants a permanent placement in this controlled unit.

9. When an inmate has become uncooperative and has failed to follow verbal directives, he may initially be placed in a TPU holding cell to allow staff time to complete conduct reports and for those reports to be reviewed by the shift Captain. It so provides parties with time to calm down and rethink their situation. For the inmates in particular, it provides quiet and privacy, which is conducive to de-escalating situations where an inmate has displayed disruptive behavior.

10. While the inmate is in the holding cell, I investigate the situation further to determine if the inmate should spend more time in TPU beyond the initial placement period.

11. In inmate Brown's case, I determined that time spent in the holding cell of a few hours should suffice for his situation. because by the time he was released, he was calm and no longer disruptive.

12. Even though inmate Brown had violated multiple Institutional Rules, the decision was made to not proceed with a conduct report against him. Rather, inmate Brown was verbally counseled about his misconduct and departmental policies.

13. Inmate Brown was then released from TPU and directed to return to his Unit.

14. When inmate Brown was released from TPU, the count supervisor's office had assigned another inmate to the bed area previously held by inmate Brown, requiring inmate Brown to receive a new bed assignment.

15. The shift supervisors do not participate in Unit moves. The shift supervisors only process moves for security reasons which would be a permanent TPU placement. Neither I, nor anyone on my staff, retaliated against inmate Brown by giving him a bed reassignment.

16. Even with the new bed assignment, inmate Brown stayed the A unit. He went from staying in 'I House in Unit A' to staying in '2

> House in Unit A'. J They are right beside each other. There is no
> difference in the types of inmates or security classifications of
> inmates assigned to 1 House vs. 2 House in Unit A. No beds in either
> House are reserved
> for problem inmates.

The Motion for Summary Judgment was served on Plaintiff August 17, 2020. He had from then until November 5, 2020, to prepare his opposition. His account of what actually happened is in his Affidavit submitted in opposition to summary judgment:

> 2. On Wednesday, November 7, 2018, I handed Sergeant Owen
> McRobie, House Sergeant of 1 House, Belmont Correctional
> Institution, (hereinafter "McRobie") an envelope containing time
> sensitive legal mail. The mail needed to be sent to the cashier's office
> to add a copy of my financial statement to the envelopes. On Friday,
> November 9, 2018, at approximately 1:30 pm, I checked the JPay
> kiosk and noticed that nothing had been deducted for the legal mail.
> I saw John Ruiz, Unit Manager of A-unit, (hereinafter "Ruiz") in the
> case managers office and I asked if he could inquire into the matter.
> I explained the time sensitive nature of the mail. Ruiz informed me
> that he was too busy and that I should ask McRobie to help me.
>
> 3. I approached McRobie and asked if he could possibly call the
> cashier and check the status. I stressed the urgency of the time
> sensitive nature. (The BeCI Law Library hours had been so limited
> in the days leading up to the deadline for mailing that the delay was
> out of my control.) McRobie's response was: "I did my job and took
> it up front." He quickly dismissed me citing he was busy. I asked if
> there was someone else who could help me and he suddenly became
> angry and demanded I leave his office.
>
> 4. Seeing no solution in my unit, I went to the Captain's office. I
> simply needed someone to call and confirm the envelope that was
> clearly marked "Time Sensitive Legal Mail" was processed and
> mailed that day. I spoke with the on duty Captain and he told me
> sternly: "Not my job, go back to your unit. It's up to them to do that."
>
> 5. I returned to speak with Ruiz. I was frustrated with the dead ends
> and back and forth. I entered Ruiz's office and said: "I understand

13

that you guys are busy, but can someone look into this issue? McRobie said he was busy. Is there anyone that you can send me to, to get this looked into?" Ruiz once again said he was too busy and complained that he should have left an hour earlier. I explained how the matter was very importat [sic] and that the legal mail was time sensitive. He said he was about to leave and began to put his coat on. At this point I told him: ''The Captain's office said someone in this unit is responsible to do this. I've asked you and McRobie. I really need this done." Ruiz became visibly angry and said: "Oh ••. You went to the Captain? Let's see what McRobie has to say about that!" We then walked over to McRobie's office.

6. We arrived and entered McRobie's office. Ruiz said: "Guess who went to the Captain's office?" To this, McRobie became furious and said: "I told you I did my job! You're on the next thing smoking out of here. Now get the fuck out of my office!" I then said: "With all due respect, I need this done. Who am I to go to, to see about it if you and Ruiz won't help me?" His response was an unprofessional: "I don't give a fuck. Now get the fuck out!"

7. At this point, I was very upset and frustrated at the utter lack of respect and assistance. I point out here in this Affidavit part of the Unit Management Statement - the part about "Unit Management and Security will work together to be responsive to Staff Concerns and the Needs of the Inmate," and something about the "High Quality of the Unit Management Services." As I recall at that moment I said to myself what hypocracy [sic].

8. Stressed out and angered I chose to walk to Mental Health Services, as a walk-in, to speak with my mental health liason [sic]. I needed to talk to someone to calm myself down. Ms. Roy (my liason [sic]) had another patient before me and told me to "Wait here a few, I will see you after I'm done with him." Ms. Clune came out and c.o. [Corrections Officer]Bodner and I were speaking. The next thing I realize, McRobie stormed into Mental Health - walked straight at me and said, menacingly,: "I'm tired of you mother fuckers running to mental health every time you have a problem. Cuff up" I was placed into handcuffs and taken to the "hole." I was

14

> not given a ticket nor had I broken any rules. I simply pissed him off.
>
> 9. A few hours later I got out of the hole and returned to 1 House only to find my belongings packed up and I had been reassigned to 2 House. 2-A-1 to be precise. This rack is generally utilized for disciplinary problem inmates. I feel as if my move was retaliatory and as a punishment for going to mental health. The energy expended on getting me moved into 2 House was far more than would have been expended making a phone call inquiring about the envelope.

(Affidavit, ECF No. 45-1, PageID 325-27.) Plaintiff's Affidavit goes on to describe how this incident has undermined his trust in the Mental Health Unit and caused him to withdraw from programs and classes. *Id.* Plaintiff supports his own Affidavit with those of inmates Tylor Trago and Joseph Lucas who aver that there is a generally open door policy at the Captain's Office, albeit unwritten (ECF No. 45-1, PageID 335-366).

On this state of the evidence, the Magistrate Judge finds there is no material dispute on the historical facts, except that Defendants and Captain Howell describe Brown as demanding and disruptive and Brown says he was quiet and respectful, although he admits he became "very upset." Brown does not deny that he was persistent in his demands and that he refused to stop making them when Robie said he would investigate later and get back to Brown. Howell is clear that it was he who decided to have Brown placed in TPU and he did not know where Brown was when he sent McRobie to place him in TPU. There is no dispute that Brown's stay in TPU was short – approximately three hours. Brown offers no evidence to contradict Howell's averment that the decision to reassign Brown's bed was made by someone else – the count supervisor – or that there is no material difference between being assigned to 2 House rather than 1 House. Brown's own Affidavit contradicts his claim that he was retaliated against for First Amendment protected

15

conduct when he claims at ¶ 9 that he was retaliated against for going to the Mental Health Unit which is not protected First Amendment conduct. While inmates Trago and Lucas perceive that the captains have an "open door" policy, that does not contradict Howell's averment that inmates have to be invited or ordered in or his characterization of Brown's behavior as "barging" in.

Based on the undisputed facts, the Magistrate Judge concludes the Defendants are entitled to judgment as a matter of law.

First of all, there is the question of what constitutes "First Amendment protected conduct." All persons within the jurisdiction of the United States have the right under the First Amendment to petition the government for redress of grievances. That includes the right to seek legal help from the courts. In *Bounds v. Smith,* 430 U.S. 817 (1977), the Supreme Court recognized prisoners' right of access to the courts and the obligation of prisons not to impede that access, upholding a plan for a prison library system in North Carolina against the claim that North Carolina had to provide lawyers as well. But prisoners may not dictate the method by which access to the courts will be assured. *Penland v. Warren County Jail*, 759 F.2d 524, 531 n.7 (6th Cir. 1985)(en banc).

In order to establish a *Bounds* violation, a prisoner must show actual injury. *Lewis v. Casey*, 518 U.S. 343 (1996).

> It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of the courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. In the context of the present case: it is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such a fashion that official interference with the presentation of claims will not occur.

*Id.* at 349. In the context of this case, while the ODRC has a constitutional obligation to allow prisoners to mail filings to the Courts, it does not have an obligation to require prison employees to put aside whatever else they are working on at a given moment to assure an inmate the particular mailing has been made. In this case, as noted above, Brown makes no claim that his mailing was not made or that he suffered any injury because it was not mailed on November 7, 2018, rather than later.[2]

To put the matter in a non-prison context, a person has a right to present a document for filing by handing it to a deputy clerk of court over the counter at one of the Clerk's Office locations. Although the First Amendment right of court access is plainly implicated, the litigant does not have the right to demand that the deputy clerk put all other work aside and docket his filing first. Much less would the litigant have the right to immediate access to the Chief Judge to complain that he had not received immediate attention to his demands. Brown has not shown he was engaged in protected conduct when he refused to take "later" for an answer from McRobie.

Nor has Brown satisfied the second element of *Thaddeus-X* by showing he was subjected to an adverse action sufficient to deter other similarly-situated persons from engaging in protected conduct. Brown offers no evidence to contradict Defendants' evidence that his placement in 2 House was not adverse[3]. Respecting the three hours in TPU, Defendants argue "This single minor adverse action is undoubtably *de minimus[4]* in the prison setting and fails to substantiate a claim of

---

[2] As also noted, prison officials are impeded from interfering with inmate mailings to the courts because a prisoner's filing is made when he hands it in to the prison mailing system.

[3] Brown claims in his Opposition that he can produce evidence that the living conditions in 2 House are worse than in 1 House (ECF No. 45, PageID 318). But a litigant's obligation on summary evidence it actually to produce evidence, not to promise to produce it at trial. There is no such evidence now before the Court.

[4] The maxim is *de minimis non curat lex* [the law does not provide cures for minimal harms]," but *de minimus* is a frequent misspelling. Many years ago, in a text lost in the mists of time, a Dayton Bar Association comedy skit featured a poem riffing on the difference.

retaliation" (Motion, ECF No. 34, PageID 271, citing *Morris v. Powell*, 449 F.3d 682, 685-86 (5th Cir. 2006) and *Starr v. Dube*, 334 Fed. App'x 341, 342 (1st Cir. 2009)). The Magistrate Judge agrees that the three-hour placement in TPU is not a sufficiently substantial action to constitute an adverse action under *Thaddeus-X*.

Finally, Brown's own Affidavit contradicts his causal claim. In ¶ 9 of his Affidavit he avers that the placement in TPU was in retaliation for – i.e. was caused by – his having gone to the Mental Health Unit. The evidence of record is that Captain Howell, who is not sued here, ordered McRobie to find Brown wherever he was and confine him in TPU. There is no evidence Howell knew where Brown was and there is also no evidence that McRobie was acting on his own authority in placing Brown in TPU.

Because Brown has not shown any violation of his constitutional rights, the Court need not decide the separate issue of whether they are entitled to qualified immunity because those rights were not clearly established when they acted.

**Conclusion**

There is no dispute of the material facts in this case and on those facts Defendants McRobie and Ruiz are entitled to judgment as a matter of law. The Magistrate Judge therefore respectfully recommends that judgment be entered in favor of Defendants McRobie and Ruiz, dismissing the Complaint herein with prejudice. Because reasonable jurists would not disagree with this conclusion, it is also recommended that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

December 7, 2020.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.